IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHRISTINA ZARAGOZA, as Next | § | |
| Friend of V.L., C.L., and J.L.; and as | § | |
| Representative of the Estate of | § | |
| Christopher Lynch, | § | |
| | § | Civil Action No. |
| Plaintiff, | § | |
| | § | 3:07-CV-1704-K |
| v. | § | |
| | § | |
| DALLAS COUNTY and the | § | |
| UNIVERSITY OF TEXAS MEDICAL | § | |
| BRANCH, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are motions for summary judgment by Dallas County (Doc. No. 71) and the University of Texas Medical Branch (Doc. No. 73). The Court **GRANTS** the motions and enters summary judgment for Defendants.

Consequently, the parties' motion to stay the trial setting (Doc. No. 140) and all other outstanding motions are **DENIED as moot**.

### I.     Factual and Procedural Background

Christopher Lynch ("Lynch") was a 27-year-old man who committed suicide October 10, 2005, in the Dallas County Jail ("the jail") by overdosing on the antidepressant nortriptyline. Lynch was convicted of aggravated sexual assault with a deadly weapon and aggravated assault in 2004, and was sentenced to two terms of life in prison plus two additional twenty-year sentences.

On February 15, 2005, Lynch was referred to the nursing staff at the Dallas County Jail after his sister notified authorities that she believed he had tried to kill himself. Records show that Lynch had a red "ring" and three finger-length bruises on his neck, but "[Inmate] states that he slept w/sheet over head and woke up w/sheet around head and neck this AM." Clincal notes from that day state Lynch denied "suicidal ideation" and noted there was "no change in charges or case status." According to the clinical notes, Lynch was referred to psychiatry even though he "states he 'does not need them'" and "he will 'speak w/them to ease sister's mind.'"

A follow up by a nurse practitioner the next day showed that Lynch "[s]tates he was not going to harm himself and is not suicidal. States his sister was overreacting and he was not and is not going to harm himself." Lynch said on February 17, 2005, that "he is depressed because he just received this life sentence," according to mental health records. Medication records show Lynch received trazodone, an antidepressant, while in the jail.

Lynch was transferred to the custody of the Texas Department of Criminal Justice ("TDCJ") on March 1, 2005. After psychiatric evaluations, state prison health officials diagnosed Lynch with major depressive disorder—described as "recurrent, moderate"—but found no suicidal indications. Clinical notes state Lynch "denies thoughts of suicide or homicide." Lynch told evaluators he was having a hard time

dealing with his life sentence and had chronic pain.  As a result, he was prescribed nortryptiline, a tricyclic antidepressant, to be given in two 50 milligram capsules daily.

State authorities returned Lynch to the Dallas County Jail on September 15, 2005, on a bench warrant regarding his conviction and sentence in one of the sexual assault cases, although the reason for the warrant is not entirely clear from the record. When he was booked back into the jail, Lynch denied any psychiatric problems or suicidal thoughts in a routine screening.

On the morning of October 10, 2005, sheriffs officials were alerted to a disturbance in one of the cells.  Inside, they found Lynch lying on the floor with no pulse and began to perform CPR.  Lynch was transferred to Parkland Hospital in Dallas, where he was pronounced dead less than an hour after he was found on the floor in the jail.

An autopsy identified the cause of Lynch's death as "toxic effects of nortriptyline, which was self-administered."  The autopsy showed Lynch's blood level of nortriptyline was 19 milligrams per milliliter.  This level was more than 125 times the normal therapeutic range of 100-150 nanograms per ml, according to an affidavit by Dr. Pradan A. Nathan ("Dr. Nathan"), a staff psychiatrist for the University of Texas Medical Branch ("UTMB").

Plaintiff does not state how Lynch acquired the drug.  Nortriptyline was not prescribed to him by Dallas County personnel, nor was he provided with the drug by jail

staff.  A five-day supply sent with him by state authorities was placed with Lynch's personal effects and was returned to his family after his death.

Plaintiff Christina Zaragoza pursues claims as Lynch's common-law wife, next friend of Lynch's children, V.L., C.L., and J.L., and as representative of Lynch's estate. Plaintiff asserts claims under 28 U.S.C. § 1983 against Dallas County.  Plaintiff further asserts violations of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., ("ADA"), and the Rehabilitation Act ("RA"), 29 U.S.C. § 794, against Dallas County and UTMB.

Defendants assert they did not violate Lynch's constitutional rights or the statutory provisions of the ADA and RA and move for summary judgment.

## II.     Legal Standard

Summary judgment is appropriate when the pleadings, affidavits and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 322–25.  Once a movant makes a properly supported motion, the burden shifts to the nonmovant to show that summary judgment should not be granted; the nonmovant may not rest upon the allegations in the pleadings, but must support the response to the motion with summary judgment

evidence showing the existence of a genuine fact issue for trial. *Id*. at 321–25; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–57 (1986). All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## III. Analysis

Plaintiff asserts that jail officials and the jail's medical staff forced Lynch to endure cruel and unusual conditions of confinement of the sort prohibited by the Eighth Amendment to the United States Constitution. Plaintiff further asserts that Lynch was denied accommodations for his disability—depression—in violation of the ADA and RA.

Defendant Dallas County questions Plaintiff's standing to bring this action. It appears to the Court that Plaintiff has standing to seek damages on behalf of Lynch's minor children and his estate. *See Palo v. Dallas County*, 2006 WL 3702655, at *8–9 (N.D. Tex. Dec. 15, 2006) (Fitzwater, J.) (finding on similar facts that plaintiff had no standing for prospective injunctive relief but had standing in action for damages). Accordingly, the Court turns to the parties' arguments and addresses them in turn.

### A. Eighth Amendment Claim against Dallas County

Unlike cases in which prisoners await trial, plaintiffs that have been convicted of crimes are not able to pursue claims regarding their conditions of confinement under the Fourteenth Amendment's Due Process Clause. Instead, their claims must be grounded in the Eighth Amendment's prohibition of cruel and unusual punishments, and an

analysis of such claims must consider whether a defendant displayed both objective and subjective deliberate indifference.   Thus, the burden for conditions-of-confinement claims by someone in jail after a conviction is higher than for those awaiting trial.

Plaintiff filed the instant action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated Lynch's constitutional rights under the Eighth Amendment. Section 1983 "provides a federal cause of action for the deprivation, under color of law, of a citizen's 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994).  To state a claim under § 1983, a plaintiff must allege facts that show (1) deprivation of a right secured by the Constitution and the laws of the United States; and (2) the deprivation occurred under color of state law.  *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Bass v. Parkwood Hosp.*, 180 F.3d 234, 241 (5th Cir. 1999).

Under 42 U.S.C. § 1983, a governmental entity such as Dallas County can only be held liable if there is either an unconstitutional action by official policymakers or a policy or custom that caused the deprivation of a constitutional right.  *Monell v. Dept. of Soc. Svcs.*, 436 U.S. 658, 694 (1978); *Johnson v. Deep East Texas Regional Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004).  Municipal liability on a claim brought under section 1983 requires proof of three elements: 1) a policymaker; 2) an official policy; and 3) a violation of constitutional rights whose "moving force" is the

policy or custom.  *Monell*, 436 U.S. at 694; *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

First, Plaintiff must point to an official policymaker for Dallas County.  The official complained of must possess

> [f]inal authority to establish [county] policy with respect to the action ordered . . . .  The official must also be responsible for establishing final governmental policy respecting such activity before the [county] can be held liable. . . .  [W]hether an official had final policymaking authority is a question of state law.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82 (1986).  An employee, agency, or board of a governmental entity is not a policymaker unless the governmental entity, through its lawmakers, has delegated exclusive policymaking authority to that employee agency or board and cannot review the action or decision of the employee, agency, or board.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Worsham v. City of Pasadena*, 881 F.2d 1336, 1340–41 (5th Cir. 1989).  When the challenge relates to a custom of behavior among non-policymaking employees, which may be contrary to official policy, the plaintiff cannot rely on a single instance of unconstitutional conduct, but must demonstrate "at least a pattern of similar incidents in which the citizens were injured . . . to establish the official policy requisite to municipal liability under section 1983."  *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998).

Second, Plaintiff must show an official policy that inflicted the deprivation of Lynch's rights. *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc) Official policy is defined as:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [county] lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
>
> 2. A persistent, widespread practice of [county] officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents [county] policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the [county] or to an official to whom that body had delegated policy-making authority.

*Id.*

Third, Plaintiff must show a violation of constitutional rights whose "moving force" is the policy or custom. That is, "there must be a direct causal link between the municipal policy and the constitutional deprivation." *Piotrowski*, 237 F.3d at 580. Thus, Plaintiff must "establish both the causal link ('moving force') and the [governmental entity's] degree of culpability ('deliberate indifference' to federally protected rights)." *Snyder*, 142 F.3d at 796 (warning that "[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.").

The "Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotations and citations omitted). The treatment of convicted prisoners and the

conditions of their confinement are subject to scrutiny under the Eighth Amendment to the United States Constitution, which prohibits "cruel and unusual punishments." *Id.* "[T]he Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners. . . ." *Whitley v. Albers*, 475 U.S. 312, 327 (1986). The Eighth Amendment requires humane conditions of confinement, including assurances that prisoners will receive adequate food, shelter, clothing and medical care, and that prison officials will "take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832.

Although the Eighth Amendment's proscription of cruel and unusual punishments applies only to persons convicted of crimes, whereas the rights of pretrial detainees instead are derived from the Fourteenth Amendment's Due Process Clause, "the recognized standard of protection afforded to both convicted prisoners and pretrial detainees under the Eighth and Fourteenth Amendments" is the same. *Palmer v. Marion County*, 327 F.3d 588, 593 (7th Cir. 2003). The Cruel and Unusual Punishment Clause allows an inmate to obtain relief after being denied medical care if he proves there was a "deliberate indifference to [his] serious medical needs." *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To establish a constitutional violation, a plaintiff must show that prison or jail officials were subjectively aware of a substantial risk of serious harm and failed to take reasonable

measures to abate that risk.  *Hare v. City of Corinth* (*Hare II*), 74 F.3d 633, 649 (5th Cir. 1996) (en banc).   It is now clear that a failure to provide adequate protection against a prisoner's *known* suicidal impulses is actionable.  *Evans v. City of Marlin*, 986 F.2d 104, 107 (5th Cir. 1993) (emphasis added).  Police personnel are not required to "unerringly detect suicidal tendencies" and "the failure to train custodial officials in screening procedures to detect latent suicidal tendencies does not rise to the level of a constitutional violation." *Id.* (quoting *Burns v. City of Galveston*, 905 F.2d 100, 104 (5th Cir. 1990)).

To establish an Eighth Amendment claim, a plaintiff must plead and prove a deprivation of medical care sufficiently serious to show that "the state has abdicated a constitutionally required responsibility to attend to his medical needs," *Bienvenu v. Beauregard Parish Police Jury*, 705 F.2d 1457, 1460 (5th Cir. 1983), and that prison officials knew of and disregarded "an excessive risk to inmate health or safety." *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999).  Also, "a serious medical need may exist for psychological or psychiatric treatment, just as it may for physical ills." *Partridge v. Two Unknown Police Officers of the City of Houston*, 791 F.2d 1182, 1187 (5th Cir. 1986).

In the context of prisoner suicide, "[t]he deliberate standard is met only if there were a 'strong likelihood, rather than a mere possibility,' that self-infliction of harm would result." *Lambert v. City of Dumas*, 187 F.3d 931, 937 (8th Cir. 1999); *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Absent knowledge of a detainee's suicidal tendencies, failure to prevent suicide does not constitute deliberate indifference." *Lambert*, 187 F.3d at 938. "[T]he law is clearly established that jailers must take measures to prevent inmate suicides *once they know of the suicide risk . . .*" *Hare III*, 135 F.3d at 328–29 (quoting *Rellergert v. Cape Girardeau County*, 924 F.2d 794, 797 (8th Cir. 1991)) (emphasis added). Yet the Fifth Circuit "cannot say that the law is established with any clarity as to what those measures must be." *Hare III*, 135 F.3d at 328-29. "Accordingly, to be considered deliberately indifferent to a known suicide risk, an officer's acts must constitute at least more than a mere 'oversight.'" *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 395 (5th Cir. 2000).

Most prisoners at the Dallas County Jail are pretrial detainees with full Fourteenth Amendment due process rights against punishment. The Jail is not a penitentiary or prison and generally does not hold long-term inmates. Although Lynch was awaiting court proceedings at the time of his death, he had been convicted of sexual assault and assault already and was serving a life sentence. Thus, his status at the Dallas County Jail was that of a convicted prisoner rather than a pretrial detainee. The distinction is important  because of the different legal standards applied to convicted prisoners and pretrial detainees.

### a. Convicted Prisoners vs. Pretrial Detainees

In response to Defendants' summary judgment motions, Plaintiff argues that a conditions of confinement claim by a convicted prisoner does not require a finding of subjective deliberate indifference.  Instead, Plaintiff states, the poor conditions in the jail allow a court to presume an intent by officials to violate prisoners' constitutional rights. "Thus, because Dallas County policymakers had actual knowledge of the shocking conditions in the jail, no inquiry into their subjective state of mind is required."  Plf.'s Resp. at 17.  Plaintiff asserts she need only show that the conditions of Lynch's confinement were objectively inadequate to support a finding by the Court that Dallas County intended to violate prisoners' rights.

Plaintiff appears to conflate the law on this point, failing to distinguish convicted prisoners from pretrial detainees.  Pretrial detainees retain a due process right against "particular restrictions and conditions accompanying pretrial detention [that] amount to punishment in the constitutional sense of that word." *Bell v. Wolfish*, 441 U.S. 520, 538 (1979).  Convicted prisoners, by virtue of their convictions, have lost their right to be free of punishment.  They retain their right to be free of *cruel and unusual* punishments. *Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999).  Contrary to Plaintiff's assertions, a convicted prisoner asserting a § 1983 claim complaining of an Eighth Amendment violation due to the conditions of confinement must demonstrate subjective deliberate indifference by officials.  The Supreme Court has clearly stated that:

> We reject petitioner's invitation to adopt an objective test for deliberate indifference. We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane *conditions of confinement* unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837 (emphasis added). Therefore, an Eighth Amendment conditions of confinement claim by (or on behalf of) a convicted prisoner requires a showing of deliberate indifference by defendants. *See Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) ("Like other Eighth Amendment claims, a conditions-of-confinement claim must satisfy tests for both objective and subjective components.") (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). For the objective component, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson*, 503 U.S. at 9.

The cases upon which Plaintiff relies for the proposition that a court may infer or presume intent because of the general conditions in the jail all involved pretrial detainees. *E.g. Bell*, 441 U.S. at 539, *Hare II*, 74 F.3d at 644; *Duvall v. Dallas County*, 2008 WL 4561563 (N.D. Tex. Oct. 10, 2008); *Shepherd v. Dallas County*, 2008 WL 656889 (N.D. Tex. Mar. 6, 2008); *Palo v. Dallas County*, 2007 WL 2140590 (N.D. Tex. July 26, 2007). In the *Hare* decisions, the Fifth Circuit carefully and clearly distinguished the pretrial detainees from convicted prisoners. *Hare II*, 74 F.3d at 639–43. The Court notes that "*Hare*, including its reliance on *Bell*, remains as binding authority for a conditions of confinement case brought by a *pretrial* detainee." *Duvall*,

2008 WL 4561563, at *4 (emphasis added).  In pretrial cases, conditions of confinement that amount to punishment are not reasonably related to a legitimate governmental objective because punishment of pretrial detainees is not a legitimate governmental objective under the due process guarantees of the Fourteenth Amendment.  *Bell*, 441 U.S. at 539; *Shepherd*, 2008 WL 656889, at *2.

In contrast, cases in the Fifth Circuit involving a convicted prisoner challenging the conditions of confinement apply a deliberate indifference standard and require a showing of subjective intent.  *E.g.*, *Gobert*, 463 F.3d at 345–46 ("Finding a violation of the Eighth Amendment's prohibition against cruel and unusual punishment also requires a twofold analysis.  [Plaintiff] must first prove objective exposure to a substantial risk of serious harm.  Additionally, he must show that prison officials acted or failed to act with deliberate indifference."); *see also Domino*, 239 F.3d at 755; *Davis*, 157 F.3d at 1006.

An attempt to extend the objective standard governing claims regarding conditions of confinement by pretrial detainees to claims by convicted prisoners has been tried and rejected already in a case similar to this one.  *See Calton v. Dallas County*, 2007 WL 2453641, at *5 n.2 (N.D. Tex. Aug. 27, 2007) (Godbey, J.).  In *Calton*, a convicted prisoner incarcerated in the Dallas County Jail complained of inadequate medical care to treat his depression and suicidal impulses in the summer of 2005.  *Id.* at *1.  Finding that the subjective deliberate indifference standard was applicable to such claims by convicted prisoners against jails as opposed to prisons, the court granted summary

judgment for defendants when plaintiffs could not establish jailers' deliberate indifference. *Id.* at *9.

### b.    Dallas County was not Deliberately Indifferent

This case is thus distinguishable from *Hare*, *Shepherd*, *Duvall*, *Palo* and others involving pretrial detainees.  To prove an Eighth Amendment violation, a plaintiff must show deliberate indifference.  To prove deliberate indifference, plaintiffs are required to demonstrate that officials both knew of *and* disregarded an excessive risk that the prisoner would commit suicide.  *See Domino*, 239 F.3d at 755 (applying deliberate indifference standard to § 1983 claims by survivors of inmate who committed suicide in a Texas prison).  "Deliberate indifference is an extremely high standard to meet." *Id.* at 756.

Plaintiff does not meet this high standard.  In *Domino*, the prisoner clearly expressed suicidal thoughts to a prison psychiatrist, banged his head on a table, and committed suicide less than three hours later.  *Domino*, 239 F.3d at 753.  The prisoner had longstanding psychological problems, including recurrent major depression, bipolar disorder, and psychosis, and several prior suicide attempts. *Id.* at 753–54.  Despite these outward warning signs, the Fifth Circuit reversed the district's denial of summary judgment for the official defendant. *Id.* at 756.

In contrast, the evidence here shows Lynch never told jail or medical officials that he was suicidal.  In fact, he expressly denied any suicidal tendencies on several occasions

and had no documented psychological or psychiatric problems outside of depression. This falls far short of the conduct complained of in *Domino*, which was not enough to support a finding of deliberate indifference.

The fact that a prisoner's medical treatment "may not have been the best money could buy" is simply insufficient to establish a constitutional violation. *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992); *see also Gobert*, 463 F.3d at 349 ("[D]eliberate indifference exists wholly independent of an optimal standard of care."). The Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs. *Spears v. McCotter*, 766 F.2d 179, 181 (5th Cir. 1985). Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. *Banuelos*, 41 F.3d at 235.

Although the Plaintiff makes generalized claims that a county policy led to Lynch's death, she fails to identify what specific policy was the moving force behind the jail officials' alleged failure to prevent Lynch's suicide. *See Forgan v. Howard County*, 494 F.3d 518, 522 (5th Cir. 2007) (stating that conclusory statements attacking suicide prevention policies or claiming that officers could have been better trained are insufficient). It is undisputed that Dallas County, under Sheriff Lupe Valdez, had a suicide prevention policy at the jail. Plaintiff complains that medical technicians, rather

than nurses or doctors, provided the inmates with medication.  Plaintiff alleges this practice was inadequate to ensure inmates swallowed their medication.

The evidence here shows Lynch made repeated requests for various treatments for everything from dental work to infections to lingering injuries—and appears to have received them every time.  He was given, at various times, at least two different antidepressants.  He received examinations, dental care, and blood work.  This documented history of medical care rebuts Plaintiff's assertion that Defendants were deliberately indifferent to Lynch.

Far from *denying* Lynch treatment, as Plaintiff alleges, jail officials at worst *neglected* to provide him with the medication he had received from state prison officials.  The Dallas County Jail treated Lynch with the antidepressant trazodone and responded to numerous medical requests during his time there.  Plaintiff's complaint, then, is that the Jail violated *Lynch's* civil rights by failing to ensure that *other* prisoners actually swallowed *their* medications.  The Court is unwilling to follow this hopscotch logic.  At its core, Plaintiff's claim amounts to an allegation of malpractice or negligence.  "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  *Estelle*, 429 U.S. at 106.  Consequently, Plaintiff does not show how these policies or any other "inadequate policy" was the moving force behind Lynch's suicide.  *See Forgan*, 494 F.3d at 522.

- 17 -

Plaintiff would have this Court effectively determine that the Dallas County Jail must ensure every pill is swallowed by every inmate every time or else provide its prisoners medication only in liquid form to escape potential liability.  Plaintiff presents no case that holds a jail or prison liable for failing to prevent the suicide of a prisoner who overdosed on other prisoners' medication.

Plaintiff presents a 600-plus-page appendix to bolster her claims.  In it, Plaintiff includes deposition transcripts generated in other litigation, which the Court believes it may not consider pursuant to Federal Rule of Evidence 201.  *See Taylor v. Charter Medical Corp.*, 162 F.3d 827, 829 (5th Cir. 1998) (judicial notice may not be taken of facts neither generally known nor reasonably indisputable).  Plaintiff also includes Department of Justice findings of wholesale inadequacies at the jail—including inadequate suicide prevention—apparently to show that officials knew of and disregarded the risk of inmate suicides.  The findings, however, were delivered in a letter dated Dec. 8, 2006, more than a year after Lynch's suicide.  In fact, Lynch's death is referenced in the letter.  Plf.'s App. 182.  Even though jail officials may have been aware of deficiencies with regard to state standards, there is no evidence they were aware of the evidence in the Justice Department's findings in 2005.  Thus, the letter cannot show jail officials were deliberately indifferent at the time of Lynch's death to any potential constitutional violations that were initially identified in the letter more than a year later.

Plaintiff's expert, Dr. David L. Thomas, opines that "Mr. Lynch's suicide was directly and proximately caused by the conditions of confinement to which he was subjected." *Id.* at 588. But Dr. Thomas later asserts that "there is no legitimate governmental interest served by keeping incarcerated persons in conditions of confinement where the access to and the provision of mental health care and custody is so *negligent*." *Id.* at 590 (emphasis added). Again, negligence by jail officials is not enough to support an Eighth Amendment claim.

Plaintiff cites deposition testimony by former Dallas County Deputy Chief Edgar McMillan, in which the sheriff's official recalled past suicides at the jail to show officials were aware of the potential for Lynch's suicide. McMillan, however, simply remarked that during the course of his thirty-seven-year career, he had seen numerous suicide attempts. *Id.* at 400. Some of these involved overdoses, McMillan said, but he referred specifically to inmates who would "pop" illegal substances at the time of their arrest and later die in the jail. *Id.* Although Plaintiff's attempt to tie McMillan's knowledge of previous suicides in the jail to Lynch's death, Plaintiff fails to show how sporadic suicides illustrate deliberate indifference by Dallas Count jailers. *See Thompson v. Upshur County*, 245 F.3d 447, 463 (5th Cir. 2001) ("Our precedent makes clear that deliberate indifference on the part of a policymaker cannot generally be shown from a single violation of constitutional rights or expert testimony."); *Scott*, 114 F.3d at 54 (holding

that the city had no reason to know that its policy created a substantial risk of harm because the same procedures had been followed without incident since the late 1970s).

Despite a determined effort, Plaintiff has not shown that a reasonable jury could find that Dallas County denied Lynch the "minimal civilized measure of life's necessities" or his basic human needs. Plaintiff further has not demonstrated deliberate indifference by county officials. Accordingly, the alleged failure to prevent Lynch's suicide does not create liability for the county in this case, and the Court grants summary judgment for Dallas County on Plaintiff's Eighth Amendment claim.

## B.    ADA and Rehabilitation Act Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 28 U.S.C. § 12132. To establish a cause of action under Title II of the ADA, a plaintiff must establish: (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits or discrimination is by reason of his disability. *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004). Title II authorizes suits by private citizens for money damages against public entities that violate § 12132.

*See* 42 U.S.C. § 12133 (incorporating by reference 29 U.S.C. § 794a); *United States v. Georgia*, 546 U.S. at 153–54.

To state a claim under the Rehabilitation Act, 29 U.S.C. § 794, a plaintiff must show that (1) he was a qualified individual with a disability, (2) the program or facility received federal funding; and (3) he was adversely treated *solely* as a result of the disability. *Chandler v. City of Dallas*, 2 F.3d 1385, 1390 (5th Cir. 1993) (emphasis added).

Defendants assert that Lynch was not disabled within the meaning of the statutes. A disability is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). Plaintiff asserts that Lynch was disabled due to his depression. Similar mental conditions have generally not been considered disabilities for purposes of these statutes. *See Greene v. Potter*, 240 Fed. Appx. 657 (5th Cir. 2007) (chronic schizophrenia and depression was not a disability for purposes of the Rehabilitation Act); *Adam v. Dickinson Place Charitable Corp.*, 119 F.3d 1 (5th Cir. 1997) (manic-depressive bipolar disorder is not a disability for purposes of the statutes). More recent amendments to the ADA, the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008), may broaden the scope of protection but are not retroactive and are thus inapplicable. *See E.E.O.C. v. Agro Distribution, LLC*, 555 F.3d 462, 469 n.8 (2009) (finding the ADAAA "changes do not apply retroactively"). Even though Lynch's depression does not qualify

him as disabled under the statutes, for purposes of appeal the Court will examine their potential application to Dallas County and UTMB for purposes of Plaintiff's damages claim for intentional discrimination.

In *Delano-Pyle v. Victoria County, Tex.*, 302 F.3d 567 (5th Cir. 2002), the Fifth Circuit noted that a "plaintiff asserting a private cause of action for violations under the ADA or the RA may only recover compensatory damages upon a showing of intentional discrimination." 302 F.3d at 575. This is a higher standard than deliberate indifference, which is not "applicable to public entities for purposes of the ADA or RA." *Id.* Punitive damages are unavailable. *Barnes v. Gorman*, 536 U.S. 181, 189–90 (2002).

Acts of negligence do not come within the ambit of the ADA. *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 931 (7th Cir. 2004). The ADA, which generally tracks the language set forth in the RA, expressly provides that "[t]he remedies, procedures and rights" available under the RA are also accessible under the ADA. *Delano-Pyle*, 302 F.3d at 574 (quoting 42 U.S.C. § 12133). Thus the two statutes are analyzed similarly.

### 1.    Dallas County

The Supreme Court has noted that, "it is quite plausible that the alleged deliberate refusal of prison officials to accommodate [a prisoner's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs" may constitute "'exclu[sion] from participation in or . . . den[ial of] the

benefits of' the prison's 'services, programs, or activities.'" *United States v. Georgia*, 546 U.S. at 157 (quoting 42 U.S.C. § 12132).

The accommodation provisions of the ADA and RA do not require public entities to "guess" an individual's need for an accommodation. *See, e.g., Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999); *Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 934 (7th Cir. 1995) (stating that the "ADA does not require clairvoyance"). Under the RA and Title II of the ADA, a plaintiff must show "that the [defendant] knew not only of the [individual's] disability, but also of the physical or mental limitations resulting therefrom." *Seaman v. CPSH, Inc.*, 179 F.3d 297, 300 (5th Cir. 1999) (citing 42 U.S.C. § 12112(b)(5)(A)). A disabled individual's burden to request an accommodation applies "[w]here the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent." *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996).

Dallas County knew about Lynch's depression. Yet even if his depression qualifies as a disability, it does not appear that the alleged resulting limitations and the need for reasonable accommodations suggested here by Plaintiff were open, obvious, and apparent. Plaintiff has not shown that Lynch was intentionally denied some benefit that was afforded other prisoners, either by reason of or solely because of his claimed disability. Nor has Plaintiff shown that Dallas County deliberately refused to accommodate Lynch's alleged disability. To the contrary, the jail provided Lynch with

an antidepressant, and he was seen and evaluated by various medical personnel.  The Court thus is unable to identify any benefit or service that was denied Lynch on the basis of his disability.  The Plaintiff has offered no evidence that Dallas County denied any medical service to mentally ill prisoners in general, or to Lynch specifically, while providing treatment to those prisoners who were not mentally ill.

Thus, even if Lynch was disabled under the statutes, Plaintiff has failed to meet her burden.  The Court grants summary judgment for Defendant Dallas County on Plaintiff's ADA and RA claims.

### 2.    UTMB

To the extent that Plaintiff sues UTMB, her suit is in effect against the State of Texas.  A lawsuit against a state agency is generally barred by the doctrine of sovereign immunity, whether the movant seeks damages or injunctive relief.  *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101–02 (1984); *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 418 (5th Cir. 2004).  Unless expressly waived, the Eleventh Amendment bars an action in federal court by a citizen of a state against his or her own state, including a state agency.  *Martinez v. Texas Dep't of Criminal Justice*, 300 F.3d 567, 574 (5th Cir. 2002).  UTMB is an agency of the State of Texas, meaning that it is generally entitled to Eleventh Amendment immunity.  *See* TEX. EDUC. CODE § 61.003(5); TEX. GOV'T CODE § 572.002(10)(B); *Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998).

Yet the Supreme Court has held that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *United States v. Georgia*, 546 U.S. 151, 159 (2006) (emphasis in original). The Supreme Court has held that Title II of the ADA applies to state prison facilities and state prison services. *See Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998) (noting that state prisons "fall squarely within the statutory definition of 'public entity'" because the ADA, 42 U.S.C. § 12131(1)(B), defines public entity as "any department, agency, special purpose district, or other instrumentality of a State or States or local government"). Thus, Plaintiff may state a claim for damages against UTMB pursuant to the ADA only for actual constitutional violations.

As detailed in the analysis applicable to Dallas County, Plaintiff has not demonstrated any violation of Lynch's constitutional rights. The ADA thus cannot abrogate UTMB's sovereign immunity in this case.

Section 504 of the RA prohibits discrimination against qualified individuals with disabilities by recipients of federal financial assistance. 29 U.S.C. § 794 et seq. Pursuant to 42 U.S.C. § 2000d-7, states and public entities receiving federal financial assistance specifically waive their Eleventh Amendment immunity from claims under § 504 of the RA. *See Miller v. Texas Tech Univ. Health Scis. Ctr.*, 421 F.3d 342 (5th Cir. 2005) (en banc); *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 453 (5th Cir.

2005) (finding that a state entity's "receipt of federal education funds constituted a knowing and voluntary waiver of sovereign immunity as to claims under § 504 [of the RA]").

UTMB does not dispute the Court's jurisdiction to hear Plaintiff's claims under the Rehabilitation Act.  Assuming UTMB is subject to the RA here, Plaintiff has failed to show that UTMB intentionally discriminated against Lynch or even that he was adversely treated *solely* as a result of the claimed disability.  The summary judgment evidence catalogs the various efforts made by Dr. Steven Bowers, a UTMB physician and jail medical director, made over several years in an attempt to convince Dallas County commissioners to improve medical care at the Jail.  Ironically, Plaintiff elsewhere cites these efforts by Dr. Bowers as evidence of the county's deliberate indifference.  It is clear that Dr. Bowers pursued additional funding and resources from Dallas County.  This is far from intentional discrimination.  Plaintiff asserts that Lynch was discriminated against when "UTMB failed to ensure that he took his medication as prescribed," when UTMB did not attempt to deliver psychiatric medications by dissolving them in water or providing them in liquid form, and when UTMB failed to integrate medical records from the state into the county's system.  Yet there is no evidence that Lynch ever had any problem taking medications as prescribed. "UTMB also grossly failed to accommodate Mr. Lynch's disability by denying him the drugs UTMB prescribed to treat his depression in TDCJ," Plaintiff asserts.  Yet there is no evidence that UTMB

denied Lynch treatment while he was in the Dallas County Jail even if he was not provided with the *same* drug he received while in state custody.  This amounts, at most, to a medical negligence claim unavailable under the statutes rather than cognizable discrimination under the RA.  Consequently, the Court grants summary judgment for Defendant UTMB on Plaintiff's ADA and RA claims.

### C.    Summary

To be clear, the Court harbors no illusions about the conditions at the Dallas County Jail, at least as they existed in 2005.  The Court notes the serious deficiencies reported at the jail, recent cases that resulted in steep jury verdicts against the county, at least one settlement, and a consent decree with the United States government providing for federal oversight of improvements at the jail.  *See Duvall*, 3:07-CV-0929-L (N.D. Tex. Apr. 21, 2009) ($355,000 judgment against Dallas County); *Shepherd*, No. 3:05-CV-1442-D (N.D. Tex. Aug. 27, 2008; Apr. 10, 2009) ($890,000 judgment plus $255,000 in attorneys' fees); *Mims v. Dallas County*, No. 3:04-CV-2754-M, 2007 WL 816748 (N.D. Tex. Feb 17, 2006) (reported $950,000 settlement); *United States of America v. Dallas County*, No. 3:07-CV-1559-N (N.D. Tex. Nov. 6, 2007) (consent decree).  Plaintiff's case here is an attempt to put conditions at the Dallas County Jail on trial once again.

It appears that the jail's medical care procedures at the time of Lynch's suicide were inadequate at best.  *See Shepherd v. Dallas County*,  2008 WL 656889, at *7

(Fitzwater, C.J.) ("[A] reasonable jury could easily find that at least some aspects of the medical care provided at the Dallas County Jail is *shockingly inadequate*, to the point that it deserves the strongest of rebukes.") (emphasis in original).

However insufficient the overall conditions of confinement at the Dallas County Jail, there is no evidence that Lynch died as a result of them or that they rose to the level of an Eighth Amendment violation with respect to him. "Deliberate suicide which is well concealed cannot be prevented even if the facility has adequate staffing," Dr. Nathan states in his affidavit.

Jail officials and medical personnel cannot be clairvoyant. Lynch repeatedly and adamantly denied suicidal tendencies. He had spent many months in many jails without self-injury or other clear suicide attempts. Lynch further appeared very familiar with jail procedures for requesting medical attention. Records show he requested high-top shoes for a prior gunshot wound to his left heel, dental care to have a tooth pulled, attention for a potential staph infection on his neck, an examination of a lump under his arm, care for a swollen leg, and requested a blood test for a possible sexually transmitted disease.

Lynch's letters home revealed his despair at his self-created situation, but jail officials had no knowledge of the contents of these letters. Although Lynch's sister expressed concern about a possible suicide attempt, jail officials reasonably relied on the opinions of medical personnel who spoke with Lynch, the absence of any suicidal indications in the intervening eight months, and Lynch's repeated denials of suicidal

thoughts.   The reasons why Lynch took his own life cannot be determined with certainty, yet the evidence shows Lynch faced lifetime incarceration, additional court proceedings, and suffered from various medical maladies.

Allegations of deliberate indifference to a substantial risk must identify a perceptible risk.   Plaintiff's argument is that by their inaction, Defendants were deliberately indifferent to the risk that a depressed prisoner who was not receiving a particular medication might commit suicide by seeking out that medication in lethal quantities from other prisoners who had failed to swallow their own prescriptions.  It is stretching, at best, to accuse the jail of failing to provide Lynch with the "minimal civilized measure of life's necessities," *Farmer*, 511 U.S. at 834, by not ensuring that other prisoners swallowed their own prescribed medications.

"Suicide is inherently difficult for anyone to predict, particularly in the depressing prison setting." *Domino*, 239 F.3d at 756 (citing *Collignon v. Milwaukee County*, 163 F.3d 982, 990 (7th Cir. 1998)).   Studies have shown that jail inmates are much more likely to commit suicide than free persons; one prominent study shows they are nine times as likely to take their own lives.  LINDSAY M. HAYES & JOSEPH R. ROWAN, NATIONAL STUDY OF JAIL SUICIDES: SEVEN YEARS LATER 54 (National Center on Institutions and Alternatives, Feb. 1988).  Yet according to this study, the most recent one produced by the National Center on Institutions and Alternatives, 32.8 percent of detention facility suicides occur within the first twenty-four hours of incarceration and 97.4 percent within

the first seven months.  *Id.* at 36.  Thus, when Lynch killed himself some eight months after his sister reported to jail officials that he was potentially suicidal, the statistical likelihood of suicide was greatly diminished.  Furthermore, the study found 94 percent of all jail suicides were by hanging.  *Id.* at 55.  Jail officials familiar with the statistical realities of inmate suicides, combined with Lynch's repeated professions that he lacked any suicidal intent, would have no cause to believe he would take his own life at the time and in the manner he did and did not show deliberate indifference.

### IV.    Conclusion

For the foregoing reasons, Defendants' motions for summary judgment are **GRANTED**, and Plaintiff's claims are hereby **DISMISSED with prejudice**.

A separate judgment will issue.

**SO ORDERED**.

Signed July 13th, 2009.


_Ed Kinkeade_
ED KINKEADE
UNITED STATES DISTRICT JUDGE

- 30 -